# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1186V

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * |
| DOUGLAS GOLDEN AND RISHANNE DRADT, *as parents and next of kin of the decedent,* HALEIGH GOLDEN, | Special Master Jennifer A. Shah |
| Petitioners, | |
| v. | Filed: October 21, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | |

*Courtney Jorgenson,* Siri & Glimstad, LLP, Phoenix, AZ, for Petitioners.
*Madelyn Weeks*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING INTERIM ATTORNEYS' FEES AND COSTS[1]

On September 11, 2020, Douglas Golden and Rishanne Dradt ("Petitioners") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program"), alleging that their daughter, Haleigh Golden ("Ms. Golden" or "H.G."), suffered a severe adverse reaction that ultimately caused her death on November 6, 2018, from the Meningitis MTV-4 (meningococcal) vaccine she received on June 1, 2016. ECF No. 1 ("Pet.") at 1.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

On October 14, 2022, Respondent filed his Rule 4(c) Report, opposing compensation in this case. ECF No. 38 at 2. Thereafter, Petitioners filed additional medical records, and both parties submitted expert reports and medical literature. *See* ECF Nos. 46, 57, 58, 60-63, 66, 76. This case was reassigned to my docket on August 13, 2024. ECF No. 65.

On December 29, 2024, Petitioners filed an application for interim attorneys' fees and costs, requesting a total of $61,538.29, comprised of $30,560.00 for attorneys' fees and $30,978.29 for attorneys' costs. ECF No. 68 ("Fees App.") at 7. Respondent filed a response on January 23, 2025, opposing Petitioners' fees application on the ground that Petitioners lacked a reasonable basis for their claim and had not made a special showing warranting an interim award. ECF No. 71 ("Fees Resp."). Petitioners filed a reply brief, arguing that "Respondent's opposition does not address reasonable basis underlying the filing of the claim, but rather attempts to make an entitlement argument as to why [Petitioners'] case should fail." ECF No. 72 ("Fees Reply") at 1. This is Petitioners' first motion for interim fees and costs. Petitioners have not incurred any personal costs. Fees App. at 12.

Petitioners were initially represented by Mr. Andrew D. Downing. On January 3, 2025, Ms. Alison Haskins filed a motion to substitute as counsel for Petitioners. ECF No. 69. On January 24, 2025, Ms. Courtney Jorgenson filed a motion to substitute as counsel for Petitioners. ECF No. 74.

I hereby **GRANT IN PART** Petitioners' application and award a total of **$60,538.29** in interim attorneys' fees and costs.

I.   **Legal Standard**

   A. **Interim Attorneys' Fees and Costs**

The Federal Circuit has held that an award of interim attorneys' fees and costs is permissible under the Vaccine Act. *Shaw v. Sec'y of Health & Hum. Servs.,* 609 F.3d 1372 (Fed. Cir. 2010); *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343 (Fed. Cir. 2008). In *Cloer*, the Federal Circuit noted that "Congress [has] made clear that denying interim attorneys' fees under the Vaccine Act is contrary to an underlying purpose of the Vaccine Act." *Cloer v. Sec'y of Health & Hum. Servs.*, 675 F.3d 1358, 1361-62 (Fed. Cir. 2012).

In *Avera,* the Federal Circuit stated that "[i]nterim fees are particularly appropriate in cases where proceedings are protracted, and costly experts must be retained." *Avera*, 515 F.3d at 1352. Likewise, in *Shaw,* the Federal Circuit held that "where the claimant establishes that the cost of litigation has imposed an undue hardship and there exists a good faith basis for the claim, it is proper for the special master to award interim attorneys' fees." 609 F.3d at 1375. *Avera* did not, however, define when interim fees are appropriate; rather, it has been interpreted to allow special masters discretion. *See Avera*, 515 F.3d at 1352; *Kirk v. Sec'y of Health & Hum. Servs.*, No. 08-241V, 2009 WL 775396, at *2 (Fed. Cl. Spec. Mstr. Mar. 13, 2009); *Bear v. Sec'y of Health & Hum. Servs.*, No. 11-362V, 2013 WL 691963, at *4 (Fed. Cl. Spec. Mstr. Feb. 4, 2013). Special masters have viewed the three *Avera* criteria -- protracted proceedings, costly expert testimony, and undue hardship -- as factors to consider in a flexible balancing test. *Avera*, 515 F.3d at 1352;

2

*see Al-Uffi v. Sec'y of Health & Hum. Servs.*, No. 13-956V, 2015 WL 6181669, at *7 (Fed. Cl. Spec. Mstr. Sept. 30, 2015).

The undue hardship inquiry looks at more than just financial involvement of a petitioner; it also looks at expenditures by a petitioner's counsel. *Kirk*, 2009 WL 775396, at *2. Referring to *Avera*, former Chief Special Master Golkiewicz in *Kirk* found that "the general principle underlying an award of interim fees [is] clear: avoid working a substantial financial hardship on petitioners and their counsel." *Id*.

### B. Good Faith

A petitioner is eligible for an interim award of reasonable attorneys' fees and costs only if the special master finds that the petition was brought in good faith and with a reasonable basis. §15(e)(1); *Avera*, 515 F.3d at 1352; *Shaw*, 609 F.3d at 1372; *Woods v. Sec'y of Health & Hum. Servs.*, 105 Fed. Cl. 148, 154 (2012); *Friedman v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 323, 334 (2010); *Doe 21 v. Sec'y of Health & Hum. Servs.*, 89 Fed. Cl. 661, 668 (2009); *Bear*, 2013 WL 691963, at *5; *Lumsden v. Sec'y of Health & Hum. Servs.*, No. 97-588V, 2012 WL 1450520, at *4 (Fed. Cl. Spec. Mstr. Mar. 28, 2012). The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). It "focuses upon whether [P]etitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as petitioner had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

### C. Reasonable Basis

Unlike the good faith inquiry, an analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner*, 2007 WL 4410030, at *6-7. Instead, the claim must be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Hum. Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015).

Although the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. United States,* 116 Fed. Cl. 276, 283 (2014). The Court of Federal Claims affirmed in *Chuisano* that "[a]t the most basic level, a petitioner who submits no evidence would not be found to have reasonable basis. . ." *Id.* at 286. The *Chuisano* court found that a petition that relies on temporal proximity and a petitioner's affidavit is not sufficient to establish reasonable basis. *Id.* at 290; *see also Turpin v. Sec'y Health & Hum. Servs.*, No. 99-564V, 2005 WL 1026714, *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis when petitioner submitted an affidavit and no other records); *Brown v. Sec'y Health & Hum. Servs.*, No. 99-539V, 2005 WL 1026713, *2 (Fed. Cl. Spec. Mstr. Mar. 11, 2005) (finding no

reasonable basis when petitioner presented only e-mails between her and her attorney). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1346 (Fed. Cir. 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); *see also James-Cornelius v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021) (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis").

"[I]n deciding reasonable basis the [s]pecial [m]aster needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018). Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). Special masters and judges of the Court of Federal Claims have interpreted this provision to mean that petitioners must submit medical records or expert medical opinion in support of causation-in-fact claims. *See Waterman v. Sec'y of Health & Hum. Servs.,* 123 Fed. Cl. 564, 574 (2015) (citing *Dickerson v. Sec'y of Health & Hum. Servs*., 35 Fed. Cl. 593, 599 (1996) (stating that medical opinion evidence is required to support an on-Table theory where medical records fail to establish a Table injury)).

When determining if a reasonable basis exists, a special master may consider a myriad of factors, including "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289. This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

## II.    Factual Background

This is a tragic case involving the death of a young woman, Haleigh Golden. Ms. Golden was 17 years old when she was given the subject meningococcal vaccine on June 1, 2016. Ex. 5 at 3. She had a prior diagnosis of asthma, but no other health history of significance.

In the fall of 2016, Ms. Golden began college. On September 20, 2016, her father called her pediatrician to report that she was experiencing head, back, and neck pain while at school. Ex. 5 at 53. The provider noted that Ms. Golden had received a meningococcal vaccine but stated that the vaccine was "not full protection of meningitis." *Id.* The provider advised that if Ms. Golden should go to the college clinic if she developed a severe headache with fever, pain with flexing her neck up and down, fever lasting more than 72 hours, poor intake, or rash. *Id.*

The next day, Ms. Golden presented to the emergency department ("ED") at the University of Cincinnati Medical Center. Ex. 9 at 11. She complained of four days of headache, myalgia, arthralgia, and pain along her spinal column. *Id.* Her father accompanied her to the ED and expressed concern that she had meningitis. *Id.* She had no rash. *Id.* She had a cough without sputum production. *Id.* She denied neck stiffness, nausea, vomiting, or diarrhea. *Id.* She did not

have any known contacts with ill persons in her dorm.  *Id.*  She did not have pain with extraocular motion.  *Id.*

On exam, Ms. Golden had full range of motion in her neck, along with negative Kernig and Brudzinski signs[3] of meningitis.  Ex. 9 at 13.  Based on these findings, the examining physician did not suspect meningitis.  *Id.* ("Although the patient's mother was concerned about her having meningitis this does not appear to be [the] case.").  Instead, he suspected a viral syndrome, which the he noted the "patient's father" agreed was more likely as well.  *Id.*  As such, Ms. Golden did not undergo a lumbar puncture, CT scan, or blood work.  *Id.*  She declined a prescription pain medicine.  *Id.*  She was discharged with instructions to immediately return if she had vomiting, changes in mental status, stiff neck, or other concerns.  *Id.*

Almost three months later, on December 20, 2016, Ms. Golden was taken to an ED in Orlando, Florida, while on vacation with her family.  Ex. 3 at 16.  Her mother reported that she woke up the first day of vacation, which was one week earlier, with a significant bite mark on her tongue.  *Id.* at 26.  She was able to continue with her daily activities despite this.  *Id.*  Then, that morning, Ms. Golden's sister heard her making "gurgling sounds" and discovered that she was unresponsive.  *Id.*  The family called EMS; Ms. Golden was more responsive by the time EMS arrived.  *Id.*

Ms. Golden reported that in September 2016, she had neck pain, headaches, and one week of "flu-like" symptoms and fevers, which she said had been assessed as a possible viral meningitis.[4]  Ex. 3 at 26.  She reported she had recovered, and she denied any recent similar symptoms.  *Id.*

The ED physician diagnosed probable seizures and admitted Ms. Golden for further evaluation.  Ex. 3 at 27.  An exam, EEG, brain MRI, EKG, echocardiogram, labs, and head CT were all unremarkable.  *Id.* at 27, 29, 37-39, 55-56, 58, 143, 145.  The family was hesitant to proceed with a lumbar puncture to rule out meningitis.  *Id.* at 27.

Over the next 23 months, Ms. Golden was treated for a seizure disorder.  She was seen by both traditional and alternative medical providers.  *See generally* Exs. 4, 10, 12.  She was treated with Keppra but continued to have seizures, including at least one in October 2017 that caused her to fall from her bed, requiring an ED visit.  Ex. 9 at 33.

---

[3] Kernig sign: a sign of meningitis: the patient can easily and completely extend the lower limb when in the dorsal decubitus position but not when in the sitting posture or when lying with the thigh flexed upon the abdomen.  Kernig sign, DORLAND'S MEDICAL DICTIONARY ONLINE ("DORLAND'S"), https://www.dorlandsonline.com/dorland/definition?id=106323 (last accessed on August 21, 2025).  Brudzinski sign: 1. in meningitis, flexion of the neck usually results in flexion of the hip and knee; called also neck s. 2. in meningitis, when passive flexion of the lower limb on one side is made, a similar movement will be seen in the opposite limb; called also contralateral s.  Brudzinski sign, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=106144 (last accessed on August 21, 2025).

[4] This recitation was incorrect.  As noted above, the ED physician who treated her in September 2016 did not suspect meningitis.  Ex. 9 at 13.

5

On November 6, 2018, Ms. Golden's college roommates discovered her in bed, not breathing. Ex. 7 at 2. She had passed away. *Id.* The Hamilton County Coroner's office listed the cause of death as "epilepsy complicated by positional asphyxia" when Ms. Golden experienced a seizure while lying face down in bed. *Id.* The manner of death was ruled an accident. *Id.*

### III.  Petitioners' Expert Opinions

Petitioners have produced a total of three expert reports, along with curricula vitae and numerous items of medical literature, from two experts: internist and clinical immunologist Yehuda Shoenfeld, M.D., and neurologist Steven Spillers, M.D. Exs. 17-148.

In brief, Dr. Shoenfeld generally opined that vaccines can lead to adverse events, including death. Ex. 17 at 5. There are case reports of deaths following meningococcal and other vaccinations. *Id.* at 5-6. In several cases, death was caused by seizures after vaccination. *Id.* at 5-8. Additionally, the literature shows that meningitis can be caused by several types of vaccines. *Id.* at 5-6.

With respect to a mechanism of causation, Dr. Shoenfeld opined that the meningococcal vaccine could increase the proliferation of other pathogens in the population, termed "vaccine strain replacement theory." Ex. 17 at 9. He explained:

> Pathogens engage in competitive interactions for host cells at both the intra-host and inter-host levels. Within hosts, the immune system exerts selective pressures on pathogen communities. The introduction of vaccines alters the selection dynamic by targeting specific pathogen variants. The resultant selective pressure exerted enables non-targeted strains to proliferate and become more prevalent in a population. This phenomenon is recognized as vaccine-induced pathogen strain replacement. The replacement of strains has been documented in regard to numerous infections and infectious agents.

*Id.* He opined that Ms. Golden probably developed meningitis from "meningococcal serotypes not included in the original vaccine," causing a seizure disorder and ultimately her death. *Id.* at 22. He did not address the timing of the onset of Ms. Golden's purported meningitis or seizure disorder in relation to the vaccination.

Dr. Spillers opined that central nervous system disorders, like meningitis, are "well-known triggers of epilepsy." Ex. 19 at 4. He concluded Ms. Golden likely contracted *Neisseria meningitidis* bacterial meningitis, which was "identified by her doctors as probable meningitis," though it was not confirmed by lumbar puncture. *Id.* at 5. He agreed with Dr. Shoenfeld that this infection was likely caused by a "replacement" strain of the bacterium that was not covered by the vaccine Ms. Golden received and was therefore permitted to proliferate. *Id.* He concluded this infection led to the development of epilepsy in Ms. Golden sometime during "the three months between 20 September 2016 and 20 December 2016;" this time frame, he said, was consistent with the theory of causation offered by Dr. Shoenfeld. *Id.*

## IV. Discussion

### A. Propriety of Interim Award

The Federal Circuit has noted that interim fees "are particularly appropriate in cases where proceedings are protracted, and costly experts must be retained." *Avera*, 515 F.3d at 1352 (Fed. Cir. 2008). Respondent argues that there has been no special showing justifying an interim award here. Fees Resp. at 23. He contends that Petitioners themselves are primarily responsible for the protracted nature of this case, which was filed nearly five years ago. *Id.* at 23-24. Furthermore, the fact that Mr. Downing has withdrawn as counsel does not *per se* create an undue financial hardship for Petitioners. *Id.* Petitioners counter that their request comports with the guidelines governing interim fee requests set forth in the Initial Order issued by former Special Master Katherine E. Oler. Fees Reply at 1-3, *see also* ECF No. 14 ("Initial Order") at 5.

Under the circumstances presented here, I conclude an interim award is appropriate. This is a tragic case that has warranted careful consideration and prosecution. Since the case was commenced, though they requested numerous extensions of time, Petitioners did file the pertinent records, three expert reports, and voluminous medical literature. *See* ECF Nos. 8, 9, 17, 30, 46, 57, 60-63, 76. Furthermore, because Mr. Downing is unwinding his practice, it would be an undue hardship to him if an interim fee award were not issued. *See Kirk*, 2009 WL 775396, at *2 (financial hardship to counsel should be considered in deciding interim fee requests). Other special masters have taken a similar approach to Mr. Downing's recent interim fee requests. *See, e.g., Weiss v. Sec'y of Health & Hum. Servs.,* No. 24-546V, 2025 WL 2304491, at *2 (Fed. Cl. Spec. Mstr. July 9, 2025) (granting an interim fee award "almost wholly in light of [Mr. Downing's] withdrawal); *Breault v. Sec'y of Health & Hum. Servs.*, No. 22-1220V, 2025 WL 2028524, at *1 (Fed. Cl. Spec. Mstr. June 25, 2025); *Fiorello v. Sec'y of Health & Hum. Servs.*, No. 17-1869V, 2025 WL 785004, at *4 (Fed. Cl. Spec. Mstr. Feb. 11, 2025) (finding persuasive that "[Mr. Downing] is entirely winding down his practice, a process that will likely depend on resolution of his firm's outstanding deliverables").

### B. Good Faith and Reasonable Basis

Respondent has not contested whether the petition was filed in good faith. I conclude that Petitioners filed the petition in good faith.

Respondent's opposition to the fees request centers on the reasonable basis threshold. Fees Resp. at 16. He maintains that, despite the production of expert opinions supporting Petitioners' claim, I should, in my discretion, conclude no reasonable basis exists. *Id.* at 16-17. He criticizes the "far too attenuated" claim from the experts that the subject vaccine caused the proliferation of other pathogens, one of which infected Ms. Golden, causing meningitis and ultimately her seizure disorder and death. *Id.* at 17-18. Moreover, the medical records were misinterpreted by Petitioners' experts and do not support the opinion that Ms. Golden ever developed bacterial meningitis. *Id.* at 19-21. In any event, even if Ms. Golden developed a "non-vaccine strain" of meningitis, that constituted an intervening cause of her seizures and death, obviating vaccine causation. *Id.* at 18. Also, the onset of Ms. Golden's purported meningitis infection occurred far too long after the subject vaccination for her condition to be vaccine-caused. *Id.* at 22-23.

7

The threshold for reasonable basis is much lower than the burden to prove entitlement to compensation. Petitioners have proffered two relevant experts who have produced detailed reports and literature and have articulated a theory for how the subject vaccine caused Ms. Golden's seizure disorder and death. *See* Exs. 17, 19, 148. With this, Petitioners have met the low bar of producing more than a scintilla of evidence supporting causation. *Compare with Thatcher v. Sec'y of Health & Hum. Servs.*, 2021 WL 4287353, at *2 (Fed. Cl. Spec. Mstr. Aug. 25, 2021) (concluding the claim lacked reasonable basis because the only evidence supporting causation was a two-sentence, conclusory statement from an expert). Accordingly, in my discretion I conclude Petitioners have, to date, maintained a reasonable basis for their claim.

**C. Attorneys' Fees**

Petitioners request a total of $30,650.00 in attorneys' fees. Fees App. at 7. Petitioners bear the burden of establishing that the rates charged, hours expended, and costs incurred are reasonable. *Wasson v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 482, 484 (1993). Petitioners' former counsel, Mr. Downing, split his time between two law firms: Downing, Allison & Jorgenson, and Van Cott & Talamante, PLLC. Mr. Downing and his colleagues billed their hourly rates consistently between the two law firms.

    1. <u>Reasonable Hourly Rate</u>

A reasonable hourly rate is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of [P]etitioner's attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349).

*McCulloch* provides the framework for determining the appropriate compensation for attorneys' fees based upon the attorneys' experience. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[5]

Petitioners request compensation for Mr. Downing at the following hourly rates: $385.00 for work performed in 2021; $445.00 for work performed in 2022-2023; and $485.00 for work performed in 2024. Fees App. at 10. Petitioners request compensation for Ms. Ann Allison, counsel, at the following hourly rates: $415.00 for work performed in 2022-2023; and $435.00 for work performed in 2024. *Id.* Petitioner requests compensation for Ms. Courtney Jorgenson, counsel, at the following hourly rates: $275.00 for work performed in 2021; $345.00 for work performed in 2022-2023; and $375.00 for work performed in 2024. *Id.* Additionally, Petitioners

---

[5] The Office of Special Masters Attorneys' Forum Hourly Rate Fee Schedule for 2015 through 2025 can be accessed at: https://www.uscfc.uscourts.gov/osm-attorneys-forum-hourly-rate-fee-schedules. The hourly rates contained within the schedules are updated based on the decision in *McCulloch*, 2015 WL 5634323.

8

request compensation for Mr. Downing's paralegal staff. *Id.* at 10-11. Petitioners request compensation for Ms. Danielle Avery, paralegal, at the following hourly rates: $135.00 for work performed in 2021; $155.00 for work performed in 2022-2023; and $175.00 for work performed in 2024. *Id*. at 10-11. Petitioners request compensation for Mr. Alex Malvick, paralegal, at the following hourly rates: $155.00 for work completed in 2023; and $175.00 for work performed in 2024. *Id*. at 11. Lastly, Petitioners request compensation for Ms. Samantha Perez, paralegal, at a rate of $175.00 per hour for work performed in 2024. *Id*.

The rates requested for Mr. Downing and his colleagues are consistent with what they have previously been awarded and are in accordance with the Office of Special Masters' Fee Schedule. *See, e.g., Coons v. Sec'y of Health & Hum. Servs.*, No. 20-1067V, 2025 WL 1011347, at *2 (Fed. Cl. Spec. Mstr. Jan. 17, 2025); *Wakileh v. Sec'y of Health & Hum. Servs.*, No. 21-1136V, 2023 WL 9228198, at *3 (Fed. Cl. Spec. Mstr. Dec. 18, 2023); *Martin v. Sec'y of Health & Hum. Servs.*, No. 22-384V, 2025 WL 996725 (Fed. Cl. Spec. Mstr. Feb. 27, 2025). I see no reason to disturb Mr. Downing's requested rates and award them in full.

    2. <u>Hours Reasonably Expended</u>

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours). Further, special masters may reduce awards *sua sponte*, independent of enumerated objections from the respondent. *Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 201, 208-09 (Fed. Cl. 2009); *Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 318 (Fed. Cl. 2008), *aff'd*, No. 99-573V, 2008 WL 2066611 (Fed. Cl. Spec. Mstr. Apr. 22, 2008).

A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (Fed. Cl. 2011). Special masters may look to their experience and judgment to reduce an award of fees and costs to a level they find reasonable for the work performed. *Saxton*, 3 F.3d at 1521. It is within a special master's discretion to make a global reduction to the total amount of fees requested. *See Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991) ("special masters have wide latitude in determining the reasonableness of both attorneys' fees and costs"); *Hocraffer v. Sec'y of Health & Hum. Servs.*, No. 99-533V, 2011 WL 3705153 (Fed. Cl. Spec. Mstr. July 25, 2011), *mot. for rev. denied*, 2011 WL 6292218, at *13 (Fed. Cl. 2011) (denying review of the special master's decision and endorsing "a global – rather than line-by-line – approach to determine the reasonable number of hours expended in this case").

While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical

and secretarial tasks should not be billed at all, regardless of who performs them. *See*, *e.g.*, *McCulloch*, 2015 WL 5634323, at *26. It is well-established that billing for administrative and clerical tasks is not permitted in the Vaccine Program. *Rochester v. United States*, 18 Cl. Ct. 379, 387 (1989).

The overall hours spent on this matter by Mr. Downing and his staff appear to be largely reasonable; however, a minor reduction is necessary due to paralegal time billed for administrative and clerical tasks. These tasks can be summarized as "preparing filings to be filed," "drafting a notice of filing," filing exhibits, and receiving and reviewing ECF notifications for filed documents. *See generally* Fees App., Ex. A.

In total, the paralegals billed approximately 13.0 hours for these tasks. Because these tasks were performed by various paralegals over various years, I will deduct $1,000.00. These issues have previously been raised with Mr. Downing's firms. *See, e.g., Pearce v. Sec'y of Health & Hum. Servs.*, No. 22-1362V, 2025 WL 2306298, at *4-5 (Fed. Cl. Spec. Mstr. July 15, 2025); *Coons*, 2025 WL 1011347, at *3; *Wakileh*, 2023 WL 9228198, at *3; *Hoover on behalf of L.H. v. Sec'y of Health & Hum. Servs.*, No. 20-1394V, 2021 WL 5575768, at *9 (Fed. Cl. Spec. Mstr. Nov. 1, 2021).

Accordingly, Petitioners are awarded attorneys' fees in the amount of **$29,560.00**.

### D. Reasonable Costs

Petitioners request a total of $30,978.29 for attorneys' costs, comprised of the following: $400.00 for the Court's filing fee; $172.49 for medical records requests; $53.16 for postage and photocopies; $35.95 for medical literature; $22,045.00 for Dr. Shoenfeld's expert costs; and $8,271.69 for Dr. Spillers' expert costs. Fees App., Ex. A at 10, 49.

Petitioner provided documentation for the costs associated with the medical record requests, postage costs, printing costs, and filing expenses. Fees App., Ex. A at 36-152, 155-56; Fees App., Ex. B at 3-12. I find the costs for these items to be reasonable and award them in full. I discuss Petitioner's expert costs below.

    1. Petitioner's Expert Costs for Yehuda Shoenfeld, M.D.

Petitioner requests $22,045.00 for Dr. Shoenfeld's work. This is comprised of 44 hours of work at an hourly rate of $500.00, and a $45.00 wire transfer fee. Fees App. at 12. Dr. Shoenfeld has been awarded his requested hourly rate; therefore I see no reason to disturb this request. *See*, *e.g.*, *Robbins v. Sec'y of Health & Hum. Servs.*, No. 16-1385V, 2023 WL 9502992, at *3 (Fed. Cl. Spec. Mstr. Dec. 27, 2023); *Vance v. Sec'y of Health & Hum. Servs.*, No. 15-675V, 2021 WL 3011903, at *5 (Fed. Cl. Spec. Mstr. June 9, 2021). I will award Dr. Shoenfeld's requested hourly rate in full.

Dr. Shoenfeld spent 44 hours reviewing Ms. Golden's medical records, writing the expert report, and researching applicable medical literature. Fees App., Ex. A at 29. The total number of hours seem reasonable given the complexity of this case. Counsel for Petitioners are warned

that should Dr. Shoenfeld continue to block bill his hours, his rates or expert costs may be reduced in the future. Block billing, even for experts, is discouraged in the Vaccine Program. *See Rodriguez v. Sec'y of Health & Hum. Servs.*, No. 06-559V, 2009 WL 2568468, at *22 ("The Guidelines for Practice state that petitioner should explain costs sufficiently to demonstrate their relation to the prosecution of the petition. Without invoices, it is impossible to determine precisely what services [the expert] rendered or at what cost.") (internal quotations omitted) (citing Guidelines for Practice at 69 (Section X, Chapter 3, Part B(2). Because the overall total number of hours is reasonable, I will award Dr. Schoenfeld's expert costs in full.

2. Petitioner's Expert Costs for Steven H. Spillers, M.D.

Petitioner requests $8,271.69 for Dr. Spillers' work, at a rate of $500.00 per hour, for 993 minutes (or approximately 16.5 hours) of work. Fee App., Ex. A at 157-170. Dr. Spillers has been awarded his requested hourly rate by other special masters, and I see no reason to disturb his request. *See Morgan on Behalf of B.M. v. Sec'y of Health & Hum. Servs.*, No. 18-1324V, 2025 WL 1010935, at *3 (Fed. Cl. Spec. Mstr. Jan. 14, 2025). I find the overall number of hours expended by Dr. Spillers to be reasonable, and I will award his expert costs in full.[6]

I award Petitioner a total of **$30,978.29** in attorneys' costs.

V. **Conclusion**

Accordingly, in the exercise of the discretion afforded to me in determining the propriety of awards of interim attorneys' fees and costs, and based on the foregoing, I **GRANT IN PART** Petitioner's application. Petitioner is awarded interim attorneys' fees and costs in the total amount of **$60,538.29** as follows:

- A lump sum in the amount of **$60,538.29**, representing reimbursement of Petitioner's interim attorneys' fees and costs, to be paid through an ACH deposit to Petitioner's former counsel Mr. Andrew Downing's IOLTA account for prompt disbursement.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this decision.[7]

**IT IS SO ORDERED.**

**s/ Jennifer A. Shah**
Jennifer A. Shah
Special Master

---

[6] Dr. Spillers invoice reflects a $8.33/minute expert rate, which is extremely close to, but not quite, $500.00/hour. This explains the difference between 16.55 hours of work performed x $500.00/hour = $8,275.00, and the amount Dr. Spillers charged: $8,271.69. I will award the amount requested.

[7] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.